WEBB, Auditor, &c., *v.* BAIRD.

The R. S. 1852 did not take effect until in *May*, 1853.

The provisions of article 3, of chapter 40, of the R. S. 1843, relate only to civil suits.

Courts will give a strict construction to statutes which are against common right.

A statute requiring an attorney at law or other person to render gratuitous

services in civil cases, can not be extended by construction so as to include criminal cases.

Section 14 and the 4th clause of section 16 of chapter 59, R. S. 1843, do not continue in force section 25, p. 435, R. S. 1838.

The provision in the R. S. 1843 on the same subject of section 25, p. 435, R. S. 1838, being an independent one and containing no words of continuance in relation to the latter section, repealed it.

A statute requiring gratuitous services from the legal profession, or other particular class of citizens, in effect imposes a tax upon them, and is in violation of the requirement in the constitution which provides for a uniform and equal rate of assessment and taxation upon all citizens.

A county is liable, *ex necessitate*, for the value of the services of an attorney appointed by the Circuit Court to defend a poor person on a criminal accusation; but the Circuit Court can not fix the measure of compensation.

*Wednesday, December* 13.

APPEAL from the *Tippecanoe* Court of Common Pleas.

STUART, J.—Petition for a *mandamus* against *Webb* as auditor of *Tippecanoe* county.

It appears that in *April*, 1853, *Baird* filed in the Common Pleas his petition, verified, &c., setting forth that at the *February* term, 1853, of the *Tippecanoe* Circuit Court, under the order and by the direction of the said Court, he defended one *Thomas Wickens*, then indicted for burglary, *Wickens* being then in custody and destitute of means to employ counsel in his defence; for which service the Court, at the same time, entered of record an allowance of 25 dollars, which was ordered to be certified, &c.; that a demand had been made, &c.

On this petition the Common Pleas awarded the *mandamus.*

*Webb*, by way of return or answer to the mandate, admits that *Baird* is a practising attorney, and also all the several matters alleged; but shows for cause why he refused to draw the warrant on the treasurer in *Baird's* favor for the 25 dollars, that the Circuit Court had no authority, under the laws of the state, to order the relator, as an attorney at law, to defend *Wickens* at the expense of *Tippecanoe* county, and to order the relator to be paid out of the treasury thereof, &c.

To this return *Baird* demurred; the Court sustained the demurrer; and ordered the rule for issuing the warrant to be made absolute. *Webb* appeals.

Something is stated in the proceedings in relation to the laws of 1852 being in force and governing the case. But this is a mistake. The service was rendered and the order made in *February*, 1853. The revised statutes did not take effect till the *May* following (1). But the new constitution was in force and the R. S. 1843.

It will not be contended that the Court had the right to demand *Baird's* services as an attorney in defending *Wickens* as a pauper, without any reward. The 21st section, art. 1, of the constitution, provides, "that no man's particular services shall be demanded without just compensation." If sections 66, 67, 68, of chapter 40, R. S. 1843, authorizing the proper Court, in case of poor persons, to assign counsel who should defend without taking any fee or reward therefor, should be thought to conflict with this provision of the constitution, the inferior law must yield to the superior. But it is not necessary, in this part of the case, to notice such conflict, if any exists, beyond this guarded allusion. For article 3, chapter 40, *supra*, relates solely to civil suits. We are not aware of any such provision in the statutes of 1843, in relation to criminal cases. And as a statute requiring the services of the citizen gratuitously, is against common right, Courts would feel called upon to give it a strict construction. Consequently, a statute requiring gratuitous services in civil cases, would not be extended to criminal cases. We would, on this ground, seem relieved from the pressure of the act authorizing poor persons to prosecute or defend *in forma pauperis*, without fees to the attorneys or costs to the officers of Court.

It is contended in argument that section 25, R. S. 1838, p. 435, was continued in force by section 14, and the fourth clause of section 16, R. S. 1843, chapter 59. But such construction is unwarranted. The 14th section continues in force all acts regulating the fees and salaries of officers. But when the legislature has taken away the fees and salaries of officers, there is nothing to be regulated, and this continuing clause can not apply. There is also an express independent provision on the same subject in the statute

of 1843, and no words of continuance in relation to the provisions of the code of 1838. The latter enactment is, in its main features, wholly different from the former, and therefore repeals it.

The fourth clause of the 16th section continues all acts granting any rights to individuals, corporations, &c., meaning the individuals and corporations therein specially named. It has no reference to any abstract general law, or to persons or corporations generally.

It is not readily perceived why the argument drawn from such a source should have been pressed by the plaintiff in error.

The gratuitous defence of a pauper is placed upon two grounds, viz., as an honorary duty, even as far back as the civil law; and as a statutory requirement. Honorary duties are hardly susceptible of enforcement in a Court of law. Besides, in this state, the profession of the law was never much favored by special pecuniary emoluments, save, some years ago, in the case of docket-fees in certain contingencies. The reciprocal obligations of the profession to the body politic, are slender in proportion. Under our present constitution, it is reduced to where it always should have been, a common level with all other professions and pursuits. Its practitioners have no specific fees taxed by law—no special privileges or odious discriminations in their favor. Every voter who can find business, may practice on such terms as he contracts for. The practitioner, therefore, owes no honorary services to any other citizen, or to the public. The constitution and laws of the state go upon the just presumption that the public are discriminating enough in regard to qualifications. Every man having business in Court, is presumed to be as competent to select his legal adviser as he is to select his watchmaker or carpenter. The idea of one calling enjoying peculiar privileges, and therefore being more honorable than any other, is not congenial to our institutions. And that any class should be paid for their particular services in empty honors, is an obsolete idea, belonging to another age and to a state of society hostile to liberty and equal rights.

The legal profession having been thus properly stripped of all its odious distinctions and peculiar emoluments, the public can no longer justly demand of that class of citizens any gratuitous services which would not be demandable of every other class. To the attorney, his profession is his means of livelihood. His legal knowledge is his capital stock. His professional services are no more at the mercy of the public, as to remuneration, than are the goods of the merchant, or the crops of the farmer, or the wares of the mechanic. The law which requires gratuitous services from a particular class, in effect imposes a tax to that extent upon such class—clearly in violation of the fundamental law, which provides for a uniform and equal rate of assessment and taxation upon all the citizens.

It must be matter of congratulation to the profession that they are thus relieved from the burden of gratuitous services and useless honors; and remitted to the more substantial rewards of other citizens.

In the present case, there is no controversy about the services having been rendered, or their value. The only question is, had the Circuit Court power to order them to be paid by the county of Tippecanoe?

The statutory provision relied upon to sustain the allowance, is, in substance, that the Court shall allow to the clerk for stationery, and to the sheriff and other persons reasonable sums for fuel and necessary articles furnished, and extra services performed, during the term of the Court.

The specific articles furnished, or services performed, for which such allowances are made, shall be entered in the book containing the proceedings of said Court. R. S. 1843, c. 38, ss. 61, 62.

These two sections confer upon the Court the discretionary power of deciding what articles and what services are necessary. They confer the further discretionary power of allowing to the persons who furnish the one, or render the other, such sums as may seem reasonable. And yet, taken in connection with the context, we should have great difficulty in saying that the terms of the act itself would include an allowance for the defence of prisoners, or that

Nov. Term,
1854.

WEBB
v.
BAIRD.

any such allowance was contemplated by the legislature as included.

But that the services rendered by *Baird* were necessary to be rendered by some attorney, will scarcely admit of argument. It is not to be thought of, in a civilized community, for a moment, that any citizen put in jeopardy of life or liberty, should be debarred of counsel because he was too poor to employ such aid. No Court could be respected, or respect itself, to sit and hear such a trial. The defence of the poor, in such cases, is a duty resting somewhere, which will be at once conceded as essential to the accused, to the Court, and to the public.

And the only question is, who shall pay?

It is urged that ordinarily some attorney will volunteer in such cases. As well might it be urged in excuse for the neglect of the public duty to provide for the poor, that some one will voluntarily feed and clothe them.

An attorney of the Court is under no obligation, honorary or otherwise, to volunteer his services. As a matter of private duty, it devolves as much on any other citizen of equal wealth to employ counsel in the defence, as on the attorney to render service gratuitously. Nor indeed is it the duty of any private citizen to incur the expense. It is precisely like providing for the wants of the poor in other respects. The generous feelings which prompt acts of charity are admirable and ennobling to our nature. But even charity itself almost ceases to be a virtue, when they, whose duty it is to provide for the poor, make private charity a pretext for public neglect. If the state has not made provision for the defence of poor prisoners, it has presumed and trespassed unjustly upon the rights and generous feelings of the bar; levying upon that class a discriminating and unconstitutional tax. *Blythe v. The State*, 4 Ind. R. 525. It is therefore not their duty, and, under the circumstances, if no constitutional provision is made by law, no very great virtue, to encourage public neglect by gratuitous service.

Yet is the defence of the poor an imperative duty resting somewhere. We have seen that it does not devolve

upon the private citizen.    It must, therefore, devolve upon the public or some portion of it.    A moment's reflection would seem to fix that duty on that part of the body politic embraced in the county of *Tippecanoe.*    The poor of that county are not left to the generous charity of individual citizens.    They are provided for by law.    A poor prisoner, as to his physical wants, falls within the reason of the law, and, to that extent, is clearly embraced in the law.    If the prisoner was brought into Court not decently or comfortably clad, and was too poor to provide for himself, no one would doubt the power and duty of the Court, on general principles, without any statute, to order suitable clothes for him.    It cannot be admitted for a moment that the law regards the physical wants of the citizen of more consequence than his life or his liberty.    Whenever, therefore, the law makes provision for the one, at the public expense, the other, being within the reason of the law, is also embraced.    It seems eminently proper and just, that the treasury of the county, which bears the expense of his support, imprisonment and trial, should also be chargeable, with his defence.

But the manner in which the county treasury is to be charged, is another consideration.

On this point the decision of the Court in *Gaston* v. *The Board of Commissioners of Marion County,* 3 Ind. R. 497, removes the difficulty.    The facts were these.    The coroner called a jury to examine into the cause of death, &c. He directed Dr. *Gaston,* who was then in the employ of the county, at a given salary, to attend upon all county paupers, to make a *post mortem* examination.    For this service the doctor filed his claim with the board for 25 dollars, which they refused to allow.    He then sued the county board.    On the liability of the county, the Court say—" We have no doubt that in a case where a *post mortem* examination is really necessary, the coroner may, by his employment, bind the county to the payment for a sufficiency of professional skill to make the examination. To that extent, at least, he must be the agent of the county." *Alleghany County* v. *Watt,* 3 Penn. State R. 462.

Nov. Term,
1854.

It is admitted that there is now no statutory authority for the judge to assign counsel. *Blythe* v. *The State, supra.* Nor is there any statutory authority for the coroner to employ a physician. R. S. 1843, c. 56. In both cases it rests upon the necessity of such services to accomplish the ends of public justice. The judge who employs counsel, and the coroner who employs a physician, is, to that extent, the agent of the county.

But though, *ex necessitate*, the agents to employ, they are not the agents to fix the measure of compensation. That, like other cases of implied assumpsit, is to be determined by due course of law.

While the judge had the power to employ *Baird* at the expense of the county, he had not the power to settle the amount of compensation or make an allowance.

The judgment of the Common Pleas awarding a peremptory *mandamus* was, therefore, erroneous.

DAVISON, J., dissented.

*Per Curiam.*—The judgment is reversed with costs. Cause remanded, &c.

*H. W. Chase* and *J. A. Wilstach*, for the appellant.
*W. F. Lane*, for the appellee.

(1) The R. S. 1852 took effect on the 6th of *May*, 1853. *Jones* v. *Cavins*, 4 Ind. R. 305.—*The State* v. *Kiger, id.* 621.